[No. D037543. Fourth Dist., Div. One. Jan. 4, 2002.]

CITIZENS FOR JOBS AND THE ECONOMY et al., Plaintiffs and Respondents, v.
COUNTY OF ORANGE, Defendant and Respondent;
EL TORO REUSE PLANNING AUTHORITY et al., Interveners and Appellants.

1312

1314

**COUNSEL**

Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen and James C. Harrison for Intervener and Appellant Jeffrey C. Metzger.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Steven L. Mayer and Richard C. Jacobs for Intervener and Appellant El Toro Reuse Planning Authority.

Reed & Davidson, Dana W. Reed, Bradley W. Hertz; Strumwasser & Woocher, Fredric D. Woocher and Michael J. Strumwasser for Plaintiffs and Respondents Citizens for Jobs and the Economy, City of Newport Beach and Bruce Nestande.

Chevalier, Allen & Lichman and Barbara E. Lichman for Plaintiffs and Respondents Airport Working Group of Orange County, Inc., and David I. Ellis.

Laurence M. Watson, County Counsel, Benjamin P. de Mayo and Thomas C. Agin, Assistant County Counsel, Marianne Van Riper and James C. Harman, Deputy County Counsel, for Defendant and Respondent.

Law Offices of J. William Yeates, J. William Yeates for Planning and Conservation League as Amicus Curiae.

## OPINION

**HUFFMAN, J.**—In March 2000, the voters of the County of Orange (the County) passed an initiative measure known as Measure F, which placed a number of spending and procedural restrictions upon the Board of Supervisors of the County (the Board) regarding the planning and implementation process for the conversion to civilian use of the former Marine Corps Air Station at El Toro (MCAS El Toro), as well as other projects. Previously, in 1994, the voters of the County had passed a measure known as Measure A, which authorized the County to proceed with planning such a conversion process to establish civilian airport use at the former MCAS El Toro.

In March 2000, following four years of study of the project, and immediately after the enactment of Measure F, a number of backers of the airport project brought this action for injunctive relief and a writ of mandate to prevent the County from implementing the terms of the initiative.[1] The County was sued as a defendant and filed its own cross-complaint to contest the validity of certain spending and procedural restrictions imposed by the measure. A number of proponents of the initiative intervened in the action.[2] (Code Civ. Proc., § 389.)

The trial court was presented with a number of arguments regarding the constitutional validity of the measure and its appropriateness as a subject of an initiative. The trial court ruled the measure was void and unenforceable, and it has never gone into effect. As we will explain, the trial court was

---

[1]The backers of the airport project, and thus opponents of Measure F, included plaintiffs and respondents Citizens for Jobs and the Economy (CJE), the City of Newport Beach, and an individual, Bruce Nestande. Other plaintiffs and respondents were the Airport Working Group of Orange County, Inc., and David I. Ellis. These responding parties are collectively referred to in this opinion as Opponents.

[2]The group supporting Measure F, and thus opponents of the airport project, include intervener and appellant the El Toro Reuse Planning Authority (composed of representatives of the Cities of Lake Forest, Irvine, Dana Point, Laguna Hills, Laguna Niguel, Mission Viejo, and Laguna Woods; hereafter referred to as ETRPA). Together with the official proponent of the initiative, intervener and appellant Jeffrey C. Metzger, ETRPA is collectively referred to here as Proponents.

correct in its ruling, and we affirm the summary judgment granted in favor of the opponents of the measure.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *History*

This case has an extensive procedural history. This court has issued two unpublished decisions concerning earlier stages of the proposed project, conversion of MCAS El Toro to a civilian commercial airport providing air passenger and cargo service. In one of these prior opinions, *ETRPA v. County of Orange* (June 17, 1999, D030810 [nonpub. opn.], referred to here as our 1999 prior opinion), we set forth this general factual and procedural background of the case, which we quote in part: "El Toro was constructed as a military base beginning in 1942. As of 1994, El Toro was the largest Marine air base in the western United States. El Toro contains 4,738 acres in central Orange County adjacent to the convergence of Interstates 5 and 405, including five runways. [¶] In 1993 the federal government decided to close El Toro and scheduled closure for mid-1999. Orange County voters in November 1994 approved a ballot measure [Measure A] amending the County General Plan to permit civilian aviation at El Toro, created a process for the County to develop a reuse plan for El Toro and directed the County to focus its planning efforts on a commercial airport that would 'provid[e] a substantial portion' of the County's air passenger and air cargo demands." (1999 prior opinion.)

This ballot measure referred to in the 1999 prior opinion, a predecessor to the one at issue here, was Measure A, approved by 51 percent of the voters in November 1994. After litigation, it was upheld by this court as valid in an earlier opinion, *City of Lake Forest v. County of Orange* (June 30, 1997, D025946 [nonpub. opn.], hereafter referred to as 1997 prior opinion). Measure A had the effect of making future operation of the former MCAS El Toro as a civilian airport possible, when and if it were otherwise approved by County regulatory bodies, as consistent with the County's overall plan for development. (1997 prior opinion.) Measure A stated that the highest and best use of the former MCAS El Toro property was as a civilian commercial airport. This court rejected challenges to Measure A that it was an inappropriate amendment to the County general plan under the State Aeronautics Act (Pub. Util. Code, § 21001 et seq.) and/or under general land use planning law. (Gov. Code, § 65000 et seq.) (1997 prior opinion.)

There were disputes about participation in the planning process for conversion of MCAS El Toro. Originally, it was anticipated that pursuant to

Measure A, representatives from throughout the county would be appointed to an El Toro Airport Citizens Advisory Commission to make recommendations to the County Planning Commission and the Board regarding future use of the base. However, some cities would not participate (Lake Forest and Irvine). The County was part of the original planning advisory body, but withdrew in December 1994 to establish a new reuse planning organizational structure. Ultimately, in April 1995, the federal Department of Defense approved the County's request to be designated the sole local redevelopment authority for the civilian reuse of MCAS El Toro. (Gov. Code, § 65050 et seq.) In response, the County ordered preparation of a draft environmental impact report (EIR) for a reuse plan that included a civilian commercial airport that would serve air passengers and cargo at El Toro. (1999 prior opinion.)

Challenges were filed to the EIR as issued, resulting in judgment for the Board, which had commissioned the EIR (although several findings were made by the trial court that certain analyses in the EIR were inadequate). Our prior opinion filed in June 1999, affirmed the judgment in large part, except to reverse the findings of inadequacy. Our 1999 prior opinion recognized that even if the federal government accepted the reuse plan, the proposed airport would still require a series of implementation decisions, which would necessarily include general plan amendments, an airport master plan for development plans, and ultimately, approval of specific construction proposals.

Previously, in March 1996, opponents of the airport project had presented another ballot measure (Measure S) to the voters, asking them to repeal the 1994 Measure A and to require that any planned commercial airport use at the former MCAS El Toro be first ratified by a majority of County voters. Measure S was defeated at the polls.

In December 1996, the Board, acting in the capacity as the designated local redevelopment authority, adopted a community reuse plan for the MCAS El Toro property and submitted it to the federal Department of Defense. The plan included the new commercial airport, and other commercial, offices, and related uses. Further planning activities were authorized by the Board, directing County staff to negotiate with the Department of Defense for transfer of the property at MCAS El Toro to the County, and to begin further planning activities. These included the development of an airport system master plan, the base transition plan, an airport layout plan for the FAA (Federal Aviation Administration), and numerous environmental studies and document preparation, including further EIR and federal environmental impact statement (EIS) preparation. These activities have been going on since 1996, and the County has been funding these expenses.

B

*Measure F*

On March 7, 2000, 67.3 percent of the voters of Orange County approved the ballot measure that is challenged in this case, Measure F. Measure F is entitled "The Safe and Healthy Communities Initiative" and was scheduled to go into effect April 7, 2000. It states as its purpose that the voters should make the decision, by a two-thirds vote at a County general election, whether certain land use projects should be approved, since those projects affect the health and safety of neighborhoods and communities. The specified projects included in the initiative are new or expanded jail facilities, hazardous waste landfills, and airport projects. There is ample evidence in the record that the main objective of Measure F was to prevent construction of the proposed commercial airport, and that the other land use facilities covered by the measure were selected for their appeal to voters in different geographical areas of the county.

The operative provisions of the initiative are set forth here in pertinent part:

"Section Three: LIMITS ON BOARD OF SUPERVISORS' APPROVALS AND REQUIREMENT FOR VOTER RATIFICATION

"No act by the County of Orange to approve any new or expanded jail, hazardous waste landfill, or civilian airport project shall be valid and effective unless also subsequently ratified by a two-thirds vote of the voters voting at a County General Election.

"Section Four: LIMITS ON COUNTY EXPENDITURE OF FUNDS

"Funds may be expended by the County of Orange as necessary for the planning of any project listed in Section Three and for the submission of an approved project to the voters for ratification as required herein, but only upon a vote of the Board of Supervisors after public hearing and only to the extent necessary (A) to define the project; (B) to prepare an environmental impact report or other documentation for the project required by the California Environmental Quality Act, commencing with Section 21000 of the Public Resources Code; (C) for the evaluation and certification of such an environment impact report or documentation; (D) for the hearing or hearings required by Section Five of this Measure and other law, and for approval of the project; (E) for the placement of the approved project thereafter on the ballot of a County General Election for the vote of the People required by

this Initiative; and (F) as may otherwise be required by state or federal law. The Board of Supervisors may expend no other funds for any other purposes relating to any such project, until and unless the act by the County to approve the project is ratified by the voters as required by Section Three.

"Section Five: REQUIREMENT FOR PUBLIC HEARINGS

"Before any act by the County of Orange to approve any project listed in Section Three, the Board of Supervisors shall hold, with widespread public notice, at least one public hearing in each Orange County City that would be affected by the project. This hearing or hearings shall be held following the preparation, evaluation and certification of the environmental impact report or environmental documentation required for the project.

"Section Six: DEFINITIONS

"For purposes of this Initiative, the following definitions shall govern:

"A. 'Act by the County of Orange to approve' includes, but is not limited to, any legislative action by the Board of Supervisors, in whatever capacity, enacting, adopting, amending, approving, or authorizing any general plan, zoning ordinance, specific plan, development agreement, airport master or master development plan, airport system master plan, management agreement, acquisition or conveyance of land, lease, license, financing decision (including a grant, subsidy, loan, or other form of financial assistance), the formation of any other governmental or quasi-governmental entity, the formation of any non-profit entity, and any other legislative action to permit or facilitate any of the following:

"(1) the design or construction of any new jail, new hazardous waste landfill, or new civilian airport; [¶] . . . [¶]

"(3) the operation of any existing civilian airport beyond its current legally permissible and authorized level of operations;

"(4) the physical expansion of the facilities of any existing civilian airport beyond their current and legally authorized size, where such expansion would permit a level of civilian operations greater than that which is currently permissible and authorized;

"(5) an expansion or change in operations at any existing airport, whether military or civilian, that increases the amount or changes the type of civilian, or joint civilian and military, cargo operations; or [¶] . . . [¶]

"The ratification requirements of Section Three of this Initiative and these definitions govern and are intended to apply only to the extent that the act by the County of Orange to approve is a legislative act that may be subjected to a vote of the People pursuant to Article II, Section 11 of the California Constitution. [¶] . . . [¶]

"D. 'Civilian airport' shall mean any commercial air passenger or cargo airport in Orange County, including John Wayne Airport and any proposed civilian airport at the El Toro Marine Corps Air Station or the Los Alamitos Armed Forces Reserve Center, and any airport with joint civilian and military passenger or cargo use."

C

*Current Action*

This action, a petition for writ of mandate and a complaint for injunctive and declaratory relief, was filed March 10, 2000 (three days after the voters approved Measure F), by opponents of the measure, who included CJE, the City of Newport Beach, and an individual, Bruce Nestande. Other petitioner-plaintiffs were the Airport Working Group of Orange County, Inc., and David I. Ellis. As noted in footnote 1, *ante*, these parties are collectively referred to in this opinion as Opponents.

Although the named respondent and defendant, the County, did not officially oppose all of Measure F as invalid, it filed responsive pleadings, including a cross-complaint against Jeffrey Metzger, the official proponent of the measure, and sought a stay of the effective date of Measure F. The County contended section 4 of the measure was unlawful because it purported to control administrative or executive functions of the County Board of Supervisors, and the County was not able to comply with it because of its alleged vagueness, amid other objections. In particular, the County alleged that section 4 of Measure F, restricting public funding of the specified projects prior to voter approval, was unconstitutional as impinging on the County's financial authority and impairing existing contracts. The trial court granted a stay of the effective date of Measure F with regard to existing contracts.

In addition, backers of the initiative sought leave to intervene in the action, including the ETRPA (by then composed of representatives of the Cities of Lake Forest, Irvine, Dana Point, Laguna Hills, Laguna Niguel, Mission Viejo, and Laguna Woods). This group supported a nonaviation civilian reuse of the El Toro facility. Immediately after the measure was

passed, this group had sent a letter to the Board notifying it that it would be seeking to prove individual liability on the part of the supervisors if they did not immediately implement the terms of Measure F. Eventually, ETRPA was granted leave to intervene, as was the official proponent of the initiative, Jeffrey C. Metzger (collectively referred to as Proponents; see fn. 2, *ante*). (Code Civ. Proc., § 389.)

The Orange County bench recused itself from adjudicating the matter, several peremptory challenges of Los Angeles county judges were granted, and Judge S. James Otero was assigned from Los Angeles County to hear the case.

All parties brought motions for summary judgment, contending the only issues presented were matters of law. (Code Civ. Proc., § 437c.) We will outline the grounds for these motions in the discussion portion of this opinion.

The trial court heard oral argument and took the matter under submission, and subsequently issued an order granting the motion brought by the Opponents and issued a writ of mandate and injunctive relief to preclude the County from implementing Measure F, on the grounds it was void and unenforceable. The specific grounds of the ruling were as follows: First, the measure was found unconstitutionally vague, particularly in the use of the terms, "legislative action" and "legislative act" which the trial court deemed to be legal terms of art which would trap the innocent in the absence of interpretation of a particular act by the courts. The use of the terms, "no act to approve," and "for the planning of any project listed in Section Three," were also found to be impermissibly vague.

Next, the trial court ruled that the measure violated the single-subject rule, because the subject stated, "projects that affect the health and safety of Orange County communities," was so broad as to fail to be reasonably germane to a single subject. Next, the court ruled that air transportation was a matter of statewide concern, and there were exclusive statutory delegations of authority to county boards of supervisors to provide airports. (Gov. Code, § 26020; Pub. Util. Code, § 21661.6, subd. (c); see *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491 [247 Cal.Rptr. 362, 754 P.2d 708] (*COST*).) Further, the court found that the measure impermissibly interfered with the Board's essential government functions as relating to jails and hazardous waste landfills.

Next, the trial court found the measure impermissibly interfered with administrative or executive acts, such as defining the project, preparing and

processing EIR's, holding hearings for approval of a project, and/or placing an approved project on the ballot. Although the measure purported to deem these acts legislative, the court found they were not, because they were not the equivalent of an ordinance or resolution that would establish that such a project could be built and that would provide for the project to be completed. The court also ruled that setting the time and date of a meeting and entering into management agreements were administrative in nature, and accordingly, the initiative was beyond the scope of proper legislative acts.

This appeal followed by the Proponents, seeking to overturn the trial court's ruling and reinstate Measure F. The matter was transferred to this division of the Fourth District Court of Appeal after the justices of the Third Division recused themselves. An amicus curiae brief has been filed by the Planning and Conservation League, arguing that Measure F complies with the single-subject rule applicable to initiative measures. (Cal. Rules of Court, rule 14(b).)

D

*Other Relevant Developments*

Pursuant to a request by proponent Metzger, this court has taken judicial notice of the records in two proceedings in mandamus in the Court of Appeal, Fourth District, Division Three, both of which were preelection challenges to Measure F. (Evid. Code, §§ 452, 459.) In both cases, rulings unfavorable to the opponents of Measure F were left in place by the appellate courts, which denied petitions for writs of mandate. (*CJE v. Superior Court* (June 4, 1999, G026433) [nonpub. opn.]; also see *Mailly v. Superior Court* (Dec. 23, 1999, G026603) [nonpub opn.].) Accordingly, the measure went to a vote, and was approved in March 2000.

This court has also granted a request by Metzger for judicial notice of certain planning documents regarding airports created by the state agency, Caltrans (California Department of Transportation). They show that 34 California counties do not have airport service, which Metzger contends shows that providing an airport is not an essential governmental service.

In the instant appeal, two petitions for writ of supersedeas have been brought by Proponents of the initiative, ETRPA and Metzger. They sought (1) an order to restrain the County from funding a public relations program by the County Regional Airport Authority and (2) the imposition of stays on the effective date of certain Board resolutions that would approve an airport system master plan and allow its implementation by construction

of the airport. This court has summarily denied both petitions for writs of supersedeas.

Although no judicial notice has been requested of a related matter, this court is cognizant that a petition for writ of mandate was recently granted in *Songstad v. Superior Court* (2001) 93 Cal.App.4th 1202 [113 Cal.Rptr.2d 729]. This court directed the superior court to vacate its order that granted a petition brought by the same parties herein, Bruce Nestande and CJE, to prohibit the County Registrar of Voters from accepting for filing a petition to qualify a particular initiative for the March 2002 ballot, again relating to the civilian use of MCAS El Toro (i.e., to prohibit such airport use of the facility). That ruling allows the proponents of that future initiative to continue to attempt to qualify it for the ballot, again placing some doubt on the planned reuse of the facility as a civilian airport.

DISCUSSION

I ·

*Introduction; Issues Not Necessary for Decision*

■ The parties agree, and we concur, that only legal issues are presented by the dueling summary judgment motions, and the appropriate standard of review is de novo. (*City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (1999) 72 Cal.App.4th 366, 373 [85 Cal.Rptr.2d 28].)

■ This court is mindful that initiative measures are not to be stricken down lightly. As clearly stated in *DeVita v. County of Napa* (1995) 9 Cal.4th 763 [38 Cal.Rptr.2d 699, 889 P.2d 1019] (*DeVita*), and many other cases, the amendment to the California Constitution that confers the right of initiative and referendum declares " 'the. theory that all power of government ultimately resides in the people' and that 'the amendment speaks of initiative and referendum, not as a right granted the people, but as a power reserved by them.' [Citation.] It is ' "the duty of the courts to jealously guard this right of the people" [citation] . . . . "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right [to local initiative or referendum] be not improperly annulled." ' [Citation.]" (*Id.* at pp. 775-776, citing Cal. Const., art. II, § 11.)

Nevertheless, in reviewing the record and briefing in this case, we have found Measure F to be clearly beyond the power of the electorate and defective in these three major respects: It interferes with the essential government functions of fiscal planning and land use planning; it impermissibly interferes with administrative or executive acts; and it is unconstitutionally vague in its provisions, such that the County and its Board may

reasonably be heard to complain that they would not be able to comply with it because of its alleged vagueness.

Accordingly, these three of the main five issues presented are dispositive, and will be discussed in detail in part II, *post*. We deem it unnecessary to reach certain other issues that have been exhaustively argued here, and will discuss them only to the extent they illuminate the more pertinent and critical problems with this initiative: (1) its arguable violation of the single-subject rule, for failure of the subject stated, "projects that affect the health and safety of Orange County communities," to be reasonably germane to a single subject (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142 [90 Cal.Rptr.2d 810, 988 P.2d 1089]); and (2) the more arcane arguments presented on state preemption of the fields of airport planning (Gov. Code, § 26020; Pub. Util. Code, § 21661.6, subd. (c)); the authority of a general law county to administer its own budget under the County Budget Act (Gov. Code, § 29000 et seq.); and related preemption points on due process for the individual Board members who would be required to administer this measure. Although not dispositive, these additional arguments, taken together, point in the same direction: Measure F is an unworkable and excessive exercise of the initiative power.

## II

### *Dispositive Issues*

In *DeVita*, *supra*, 9 Cal.4th 763, 775 the Supreme Court dealt with both substantive (land use) and procedural (voter approval) aspects of whether a general plan amendment can be enacted by initiative. The court noted that the local electorate's right to initiative and referendum is guaranteed by the California Constitution, article II, section 11, and is generally co-extensive with the legislative power of the local governing body (citing *Simpson v. Hite* (1950) 36 Cal.2d 125, 129 [222 P.2d 225]).

In the land use context, both zoning ordinances and general plans are subject to amendment by initiative. As this court explained in *Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565 [63 Cal.Rptr.2d 148] (*Pala*), the Supreme Court has " 'recognized that the Legislature conceives land-use planning as legislative action—part of the political process—and not as "something distinct from the local legislative function, to be performed by an apolitical planning commission." [Citation.]' " (*Id.* at p. 573.) The test for evaluating an initiative measure that amends a general plan or zoning ordinance is whether " 'reasonable minds might differ as to the necessity or propriety of the enactment. . . .' [Citation.]" (*Id.* at p. 574.) Generally, if so, it will be found valid. (*Ibid.*)

In *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 537 [45 Cal.Rptr.2d 117] (*San Mateo*), the court upheld an initiative that made amendments to land use provisions of a county's local coastal program, as part of the general plan. The court held that they were "analogous to general plan amendments as local legislative acts subject to initiative and that local governments have broad discretion to determine the content of their land-use plans." (*Ibid.*)

■ While there is a presumption in favor of the right of initiative, it is rebuttable when it is clearly indicated that the Legislature, "as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right. [Citation.]" (*DeVita, supra,* 9 Cal.4th at p. 776.) For example, there is a general dichotomy that has been developed between a governing body's legislative acts, which are subject to initiative and referendum, and its administrative or executive acts, which are not. (*Ibid.*) Also, there is another closely related situation in which a restriction of the local initiative or referendum power will arise: Where the Legislature intended to delegate the exercise of local legislative authority exclusively to the local entity's governing body, thereby precluding initiative and referendum. (*DeVita, supra,* 9 Cal.4th at p. 776, citing *COST, supra,* 45 Cal.3d at p. 511.)

In *DeVita, supra,* 9 Cal.4th 763, the Supreme Court interpreted the references in *COST, supra,* 45 Cal.3d 491, to the use of the generic terms "legislative body" or "governing body" in a statute as not alone sufficient to dispel the presumption in favor of the local right of initiative and referendum. Rather: "To determine whether the reference to 'legislative body' signifies an intent to exclusively delegate authority to that body, we look to whether and to what extent the statute or statutory scheme in question pertains to matters of statewide concern. As we stated in *COST, supra,* 45 Cal.3d 491, 501: '[A]n intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern rather than a purely municipal affair.' This is so because the Legislature's constitutional authority to restrict the local right of initiative or referendum generally derives from its partial preemption of local government authority pursuant to the fulfillment of a state mandate or objective. [Citations.] *Only in matters that transcend local concerns can the Legislature have intended to convert the city and county governing bodies into its exclusive agents for the achievement of a 'legislative purpose of statewide import.'* [Citation.] [¶] But we never suggested in *COST* that courts are to automatically infer that a statutory scheme restricts the power of initiative or referendum merely because some elements of statewide concern are present." (*DeVita, supra,* 9 Cal.4th at pp. 780-781, italics added.)

On another procedural point in *DeVita, supra,* 9 Cal.4th at pages 796-799, the Supreme Court was faced with an argument that even if the general plan amendment by initiative were deemed valid (as it was), the particular initiative in question in that case was unlawful because of a mandatory voter approval requirement. The court responded to this argument by suggesting that initiative ordinances which broadly limit the power of future legislative bodies to carry out their duties, pursuant to either a governing charter or their own inherent police power, should not be considered to be legislative measures, but instead, are equivalent to "constitutional" provisions (which would not be subject solely to the initiative power). Such a measure would probably be an improper amendment to a city or county charter, or would improperly create a charter-like provision in a city or county that does not possess one. (*Id.* at p. 798.) However, the court explained that some initiative measures may properly circumscribe the power of future governing bodies, by requiring voter approval for certain future proposals, if those initiatives amount to legislative measures that the governing body could itself have enacted. (Elec. Code, § 9125; *DeVita, supra,* 9 Cal.4th at p. 799; also see *Pala, supra,* 54 Cal.App.4th at p. 579, fn. 10, rejecting the argument that the measure there was invalid because it constrained the County's ability to enact future legislation.)

With these parameters on the initiative power in mind, we examine the type of restrictions imposed on the local governing body by Measure F.

A

*Interference with Essential Government Functions*

■ The terms of the voter approval provision of Measure F states, *"No act by the County of Orange to approve* any new or expanded jail, hazardous waste landfill, or civilian airport project shall be valid and effective unless also subsequently ratified by a two-thirds vote of the voters voting at a County General Election." (§ 3, italics added.) In paragraph 6(A) of the measure, the term, "[a]ct by the County of Orange to approve" is defined in exhaustive detail as including, but not limited to, "any legislative action by the Board of Supervisors, in whatever capacity," with respect to enacting, etc., any general plan, airport master or master development plan, airport system master plan, acquisition or conveyance of land, formation of any other governmental or quasi-governmental entity, "and any other legislative action to permit or facilitate" development of one of the specified three types of projects.

As a threshold matter, we first note that although Measure F lists three types of projects that are subject to the voter approval requirement, there

were no known current proposals to build a hazardous waste landfill in the county as of the time of this litigation. There are potential jail projects that might be affected by the measure, but it is essentially not disputed here that the main thrust of the initiative measure was to attack the conversion to civilian use of MCAS El Toro. Our analysis is not dependent upon which type of project is under consideration, however, as it is the voter approval and spending restrictions that are the main issues presented.

We also wish to stress that this is a hybrid initiative/referendum provision, because although it is framed as an initiative, it essentially seeks to exercise the referendum power to seek voter approval of completed Board actions before they become effective. (See *San Francisco Forty Niners v. Nishioka* (1999) 75 Cal.App.4th 637, 644, fn. 5 [89 Cal.Rptr.2d 388].) Once again, the distinction between these types of measures is not dispositive here, as we are seeking to interpret the language of the voter approval and spending restrictions provisions regardless of the technical nature of the measure.

As further background, it is necessary to examine the text of Measure A, as approved by the voters in 1994. The actual ballot language asked the voters whether the initiative measure entitled "Orange County/El Toro Economic Stimulus Initiative," which would designate MCAS El Toro for civil aviation and related purposes, should be approved. The impartial analysis by the County Counsel's Office explained that the measure would amend the County general plan to designate lands found within MCAS El Toro as an airport area, to be used for civilian airport purposes, and would create the Citizens Advisory Commission and provide for further study and enactment of further amendments subject to future developments.

From comparing the text of the two provisions, we see that Measure F implicates and affects two essential government functions that were to take place pursuant to the approval of Measure A, which we will discuss in turn: land use planning and fiscal management. We first address the County's function of land use planning. Pursuant to its mandate under the 1994 Measure A, the County, through its Board, adopted a community reuse plan for the MCAS El Toro property that included the proposed new commercial airport, and other commercial, offices, and related uses. Further planning activities included the development of an airport system master plan, the base transition plan, an airport layout plan for the FAA, and numerous environmental studies and document preparation, including further EIR and federal EIS preparation. These activities have been going on since 1996, and the County has been funding these expenses. In our 1999 opinion, we outlined the purposes of such environmental and planning study: "The EIR

'is " 'the heart of CEQA' " and the "environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." ' [Citations.]" (1999 prior opinion.) Further, we said: " 'The "project" on which an EIR must be prepared "encompasses a wide spectrum, ranging from the adoption of a general plan, which is by its nature tentative and subject to change, to activities with a more immediate impact, such as the issuance of a conditional use permit for a site-specific development proposal." ' [Citations.] [¶] 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably foreseeable.' [Citation.] [¶] An EIR 'should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.' [Citation.]" (1999 prior opinion.)

We reiterate this material to illustrate the point that Measure F places numerous constraints and roadblocks on the planning and reporting process, which is mandated by state law and which is affected by federal policy in this instance, because of the Department of Defense decision to allow the conversion of MCAS El Toro to civilian use. For example, section 5 of Measure F requires the Board, before it takes any act to approve any designated project, to "hold, with widespread public notice, at least one public hearing in each Orange County City that would be affected by the project." There are 34 such cities that are potentially affected by a project, which would lead to logistical and administrative delays in such a hearing process. Moreover, it is not clear under section 3 of the measure how many voter approvals are anticipated per project, since the definition of "any act by the County to approve" is extremely broadly defined in section 6(A) of the measure. (See pt. II. C., *post.*)

The type of restrictions imposed by Measure F are significant constraints upon the ability of the Board to plan land use issues throughout the County. This type of measure is different from the one approved in *DeVita, supra,* 9 Cal.4th 763 because it is not an act that directly amends the general plan or provides other substantive policy. Rather, it essentially imposes procedural hurdles upon the planning process. This factor brings into play the authority of *COST, supra,* 45 Cal.3d 491, that the initiative power is subject to restriction if the statute or statutory scheme in question largely pertains to

matters of statewide concern: "[A]n intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern rather than a purely municipal affair." (*Id.* at p. 501.) Here, the planning of a regional civilian airport affects more than the County residents alone.

Accordingly, the cases chiefly relied upon by the Proponents are distinguishable here. In both *Pala, supra,* 54 Cal.App.4th 565 and *San Mateo, supra,* 38 Cal.App.4th 523, the initiative measures that were upheld made substantive amendments to land use provisions of a county's general plan or equivalent, to implement affirmative policy statements. In *Pala, supra,* 54 Cal.App.4th 565 this court found the initiative measure was a proper amendment to the general plan that did not rely on future legislative action. Instead, it made a specific change to a specific portion of the general plan. (*Id.* at p. 576.)

Similarly, in *San Mateo, supra,* 38 Cal.App.4th 523, the court's conclusion was that local coastal plan amendments are analogous to general plan amendments, as local legislative acts subject to initiative, and local governments have broad discretion to determine the content of their land use plans. (*Id.* at p. 537.) Measure F, however, does not make such a substantive amendment, but rather seeks to impose procedural restrictions upon otherwise authorized planning activities. It therefore essentially restricts the Board from carrying out a legislative policy already set by the voters when they enacted Measure A, by placing substantial restrictions upon the acts necessary to approve, or even study, the subject projects, which include the airport that is the subject here. When the voters defeated Measure S at the 1996 election, they indicated this legislative policy was still in place. Measure S would have repealed the 1994 Measure A, and would have required that any planned commercial airport use at the former MCAS El Toro be first ratified by a majority of County voters.

Further, Measure F places unrealistic impediments upon the planning process, by overbroadly defining the term, "any act to approve," as used in the voter approval section 3. (Measure F, § 6(A).) By doing so, it would prevent the Board, on its own behalf or as a local redevelopment authority designated by the Department of Defense, from pursuing a policy that was already in place.

Turning to the effect of Measure F upon the County's fiscal management powers, once it was enacted, the ETRPA attorney sent a letter to individual Board members notifying them that they might be exposed to personal liability if they failed to abide by the spending restrictions contained in

Measure F. One Board member is on record as saying she did not know what acts were allowed or forbidden by Measure F. At the time of the election, various planning activities were already underway, as well as public relations and other related activities. The County successfully obtained a stay of the implementation date of Measure F because of potential impairments to existing contracts for such services.

In *Rossi v. Brown* (1995) 9 Cal.4th 688 [38 Cal.Rptr.2d 363, 889 P.2d 557], the Supreme Court discussed the impact of referenda and initiatives on governmental operations in the taxation context. It referred to reasoning it had developed in *Geiger v. Board of Supervisors* (1957) 48 Cal.2d 832, 839-840 [313 P.2d 545], to the effect that managing a county government's financial affairs has been entrusted to elected representatives, such as a county board of supervisors, and was an essential function of the board.

Here, section 4 of Measure F allows the County to expend funds "as necessary for the planning of any project," and for the submission of an approved project to the voters for ratification, but only upon a vote of the Board after public hearing and only to the extent necessary, among other things, "(F) as may otherwise be required by state or federal law." Under Government Code section 25203, the Board has exclusive authority over litigation. Is this a power "otherwise required by law" for which spending must be allowed? Similarly, constitutional provisions preclude the enactment of laws impairing the obligations of contracts. (Cal. Const., art. I, § 9; U.S. Const., art. I, § 10.) Does section 4 impair the obligation of existing contracts?

Taken together, these and other factors indicate that Measure F impermissibly intrudes into Board prerogatives, particularly with respect to the functions of the Board in managing its financial affairs and in carrying out the public policy declared by Measure A. The terms of Measure F seek to broadly limit through procedural restrictions the power of future legislative bodies to carry out their duties, as prescribed to them by their own inherent police power. As such, the measure should not be considered to have a proper legislative subject matter. (*De Vita, supra,* 9 Cal.4th at pp. 796-799.)

B

*Administrative v. Legislative Acts*

As part of its ruling, the superior court found that Measure F impermissibly interfered with the Board's essential government functions not only as relating to jails and hazardous waste landfills, but also as to

administrative or executive acts, such as defining the project, preparing and processing EIR's, holding hearings for approval of a project, and/or placing an approved project on the ballot. The court noted that although the measure purported to deem these acts legislative, they were in fact not legislative, because they were not the equivalent of an ordinance or resolution that would establish that such a project could be built and that would provide for the project to be completed. The court also ruled that setting the time and date of a meeting and entering into management agreements were administrative in nature, and accordingly, the initiative was beyond the scope of proper legislative acts.

■ In *City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384 [103 Cal.Rptr.2d 269] (*Dunkl*), this court was required to outline the distinction between legislative acts, which the electorate has the power to initiate, and administrative ones, which are not subject to the initiative power: " 'While it has been generally said that the reserved power of initiative and referendum accorded by article IV, section 1, of the Constitution is to be liberally construed to uphold it whenever reasonable [citations], it is established beyond dispute that the power of referendum may be invoked only with respect to matters which are strictly legislative in character [citations]. Under an unbroken line of authorities, administrative or executive acts are not within the reach of the referendum process [citations]. The plausible rationale for this rule espoused in numerous cases is that to allow the referendum or initiative to be invoked to annul or delay the executive or administrative conduct would destroy the efficient administration of the business affairs of a city or municipality [citations].' [Citation.]" (*Id.* at p. 399.)

■ This court went on in *Dunkl, supra*, 86 Cal.App.4th 384 to state the test used to decide whether a particular ballot measure constitutes a legislative or an administrative act, as it is set out and explained in *Valentine v. Town of Ross* (1974) 39 Cal.App.3d 954, 957-958 [114 Cal.Rptr. 678]: " 'The acts, ordinances and resolutions of a municipal governing body may, of course, be legislative in nature or they may be of an administrative or executive character. [Citation.] . . . [¶] Also well settled is the distinction between the exercise of local legislative power, and acts of an administrative nature. [¶] . . . " ' "*The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.*" ' " [Citation]; . . . "Acts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. *Acts which are to be deemed as acts of administration, and*

*classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence."* [Citations.]' (Italics added.)" (*Id.* at pp. 399-400, some italics omitted; second italics added.)

In *DeVita, supra,* 9 Cal.4th 763 the Supreme Court reiterated the distinction that has been developed between a governing body's legislative acts, which are subject to initiative and referendum, and its administrative or executive acts, which are not. (*Id.* at p. 776.) As previously noted, there is another closely related situation in which a restriction of the local initiative or referendum power will arise: Where the Legislature intended to delegate the exercise of local legislative authority exclusively to the local entity's governing body, thereby precluding initiative and referendum. (*DeVita, supra,* 9 Cal.4th at p. 776, citing *COST, supra,* 45 Cal.3d at p. 511.)

This case involves a federal designation of the County as the sole local redevelopment authority for the civilian reuse of MCAS El Toro. There are also state provisions for the naming and functioning of the County as the single local base reuse entity. (Gov. Code, § 65050, subd. (d).) The Board carries out these functions. Accordingly, there is a strong legislative indication that the Board has been delegated sole or single authority for all actions regarding planning for reuse of MCAS El Toro. The County is acting through its Board not only in this capacity, but also as the federally designated local redevelopment authority. Measure F at section 6(A) refers to the requirement of voter approval of any action by the Board, in whatever capacity. This appears to be overreaching of local voter control of state-delegated planning authority of the Board. (*COST, supra,* 45 Cal.3d at p. 511.)

Here, as in *Dunkl, supra,* 86 Cal.App.4th 384, the first initiative in place (Measure A) declared certain legislative policy and directed that certain events should take place to implement that policy, as ways and means of carrying out the policy. Measure F, as approved, would not have sought to change this policy by its plain language, but rather would have changed the procedure and substance of the implementing decisions that were created by Measure A. In other words, Measure F would add layers of voter approval and hearing requirements to the implementing decisions anticipated by Measure A to be made by the Board. "In so doing, the proposed initiative is an effort to administratively negate the legislative purpose of [Measure A]." (*Id.* at p. 402.) Here, as in that case, there is no overt statement that the previous legislative policy declared by the prior initiative will be changed,

but the manner in which Measure F would restrict the Board's administrative discretion with voter approval requirements places the subject initiative "firmly within the administrative category of voter enactments, which are not permitted. As such, the proposed initiative is beyond the power of the voters to adopt." (*Ibid.*)

Moreover, this measure fails the test for an initiative that may properly circumscribe the power of future governing bodies, by requiring voter approval for certain future proposals, if such an initiative simply amounts to a legislative measure that the governing body could itself have enacted. (*DeVita, supra,* 9 Cal.4th at pp. 799-801.) Instead, it is mainly administrative in nature, by dictating how and what spending may take place on a matter in which a controlling, although flexible and open-ended, legislative policy has already been established. It does not make any difference that Measure A contemplated that the planning process had not yet been completed, and had to remain responsive to local and regional developments. The voter approval and spending restrictions contained in Measure F do not set new substantive land use policies, but instead make it difficult or impossible for the Board to carry out already established policy that the airport project should be fully investigated at least for planning purposes.

## C

### *Vagueness*

In its ruling, the trial court found Measure F was unconstitutionally vague, particularly in its use of the terms, "legislative action" and "legislative act," which were deemed by the trial court to be legal terms of art that would trap the innocent in the absence of interpretation of a particular act by the courts. The use of the terms, "no act to approve," and "for the planning of any project listed in Section Three," were also found to be impermissibly vague below. Although we disagree with a portion of this reasoning (concerning legal terms of art that would supposedly trap the innocent), we agree with the trial court's overall conclusion that this measure is so vague as to be an unworkable interference with the Board's duties.

We reach this conclusion by applying the test for facial vagueness of a legislative measure that, like this one, does not obviously infringe on the exercise of constitutional rights. (Since the measure never was placed in effect, we have no occasion to inquire into its constitutional validity as applied.) In *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188 [246 Cal.Rptr. 629, 753 P.2d 585], the Supreme Court stated the party challenging the law as impermissibly vague must "do more than identify

some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that 'the law is impermissibly vague in all of its applications.' [Citation.]" (*Id.* at p. 1201.)

In section 4 of Measure F, the County would be allowed to expend funds "*as necessary for the planning of any project* listed in Section Three and for the submission of an approved project to the voters for ratification as required herein, but only upon a vote of the Board of Supervisors after public hearing *and only to the extent necessary* (A) to define the project; (B) to prepare an environmental impact report, [etc.] . . . . The Board of Supervisors may expend no other funds *for any other purposes relating to any such project, until and unless the act by the County to approve the project is ratified by the voters* as required by Section Three." (Italics added.) Spending is also allowed "as may otherwise be required by state or federal law." These terms clearly circumscribe the discretion of the Board, but it is not possible to tell to what extent. Who is to decide what spending is necessary, or for what purposes that are sufficiently related to the project? (See *Motorola Communication & Electronics, Inc. v. Department of General Services* (1997) 55 Cal.App.4th 1340, 1350 [64 Cal.Rptr.2d 477].)

The voter approval provision that "[N]o act by the County of Orange to approve any new or expanded jail, hazardous waste landfill, or civilian airport project shall be valid and effective unless also subsequently ratified by a two-thirds vote of the voters voting at a County General Election," also contains vague terms, in that the term County General Election is not defined by the Election Code, and could be construed as occurring either every two or every four years. The County Counsel's impartial analysis stated that this was unclear at the time of the vote. It is still unclear. It also appears to be vague in the sense that it is not possible to determine from the language of the measure how many votes at general elections are required per project, since the term, "any act to approve by the board" is so broadly defined in section 6(A) of Measure F.

The uncertainty of the type of instructions imposed on the Board, in the context of the planning process authorized by Measure A, interacts in this case with the other defects already identified in the measure to demonstrate its invalidity. In the context of the factual record of this case, it is clear that the provisions of Measure F would serve to paralyze the functions of planning with respect to an unpopular project, and would create roadblocks in the form of administrative interference with the legislative policy imposed by a previous initiative measure. Moreover, the difference in character among the three types of land use planning projects affected by Measure F,

which arguably fails to satisfy the "reasonably germane" test of the single-subject rule, leads us to believe that no valid legislative policy was sought to be implemented by Measure F.

We believe this is a case in which the presumption in favor of the right of initiative is rebutted by the nature of the provisions that sought to restrict the manifold acts remaining for approval, or perhaps ultimately, disapproval of the conversion to civilian airport use of MCAS El Toro. Such a use is sufficiently a matter of statewide concern, and resembles less a governing body's legislative acts, than its administrative or executive acts, which are not properly subject to initiative and referendum. (*DeVita, supra,* 9 Cal.4th at p. 776.) This case is also an illustration of the delegation by a previous initiative of the exercise of local legislative authority exclusively to the local entity's governing body, which precludes initiative and referendum. (*Ibid.*)

In conclusion, it is clear from the language of Measure F that it is an effort to administratively negate otherwise valid planning activities that have not yet been fully carried out pursuant to Measure A. Accordingly, it is not a valid subject of an initiative measure and the trial court was correct in granting summary judgment and a writ of mandate to prevent its implementation.

## DISPOSITION

The judgment granting the motions for summary judgment, issuing declaratory relief and issuing the writ of mandate is affirmed. Each party shall bear its own costs on appeal.

Kremer, P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied February 4, 2002, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied April 17, 2002.