Filed 11/15/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| LESLIE T. WILDE, | |
| Plaintiff and Appellant, | C082664 |
| v. | (Super. Ct. No. SCCVPT16549) |
| CITY OF DUNSMUIR et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Siskiyou County, Anne Bouliane, Judge. (Assigned by the Chairperson of the Judicial Council pursuant to art. VI, § 6 of the Cal. Const.) Reversed with directions.

Leslie T. Wilde, in pro. per., for Plaintiff and Appellant.

KENNY, SNOWDEN & NORINE, John Sullivan Kenny, Linda R. Schaap and Rob J. Taylor for Defendants and Respondents.

1

In 1996, California voters adopted Proposition 218 (as approved by voters Gen. Elec. Nov. 5, 1996, eff. Nov. 6, 1996 <https://elections.cdn.sos.ca.gov/sov/1996-general/official-declaration.pdf> [as of Nov. 14, 2018], archived at <https://perma.cc/PZ9U-ABQ6>) (Proposition 218) to add article XIII C to the California Constitution by which they expressly reserved their right to challenge local taxes, assessments, fees, and charges by initiative. (See generally *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 208-209 (*Bighorn-Desert*).) This case presents the question of whether section 3 of article XIII C to the California Constitution silently repealed voters' right to challenge by referendum the same local levies for which they expressly preserved their power of initiative.

Here, the City of Dunsmuir (City) rejected a referendum measure submitted by one its residents, Leslie T. Wilde. The City rejected the referendum even though there is no dispute Wilde gathered sufficient voter signatures to qualify the referendum for the ballot to repeal Resolution 2016-02 that established a new water rate master plan. The City's rejection was based on its view that its resolution establishing new water rates is not subject to referendum, but only voter initiative. Wilde filed a petition for a writ of mandate in superior court to place the referendum on the ballot. At the same time, Wilde gathered sufficient voter signatures to place an initiative on the ballot to establish a different water rate plan.[1] The trial court denied Wilde's petition, and the City's voters rejected Wilde's initiative, Measure W.

---

[1] We grant the City's request for judicial notice of (1) Wilde's initiative (Measure W) (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), analysis by the Legislative Analyst for Prop. 218) to amend the City's water and sewer rate structure, (2) the ballot on which Measure W appeared (Ballot Pamp., Gen. Elec. (Nov. 5, 1996)), and (3) the voters' rejection of the Measure. (Evid. Code, §§ 452, subds. (d) & (h), 459.) We reject the request for judicial notice of a newspaper article entitled, "Town hall talk about Measure W in Dunsmuir." (*Mangini v. R. J. Reynolds Tobacco Co*. (1994) 7 Cal.4th 1057, 1064 [rejecting judicial notice of newspaper article because "the truth of its contents is not

On appeal, Wilde contends the trial court erred in refusing to order the City to place her referendum on the ballot. The City counters that the voters' rejection of her initiative measure moots the current appeal.

We conclude this appeal is not moot. The voters' rejection of Wilde's initiative water rate plan does not establish that the voters would necessarily have rejected Wilde's referendum on the City's water rate plan. Voters might be dissatisfied with both water rate plans and therefore reject the initiative and pass the referendum. On the merits, we conclude the voters' adoption of Proposition 218 did not abridge voters' right to challenge local resolutions and ordinances by referendum. We further conclude the trial court erred in finding the City's water rate plan was an administrative decision not subject to voter referendum. The resolution adopting an extensive water upgrade project funded by a new water rate plan was legislative in nature and therefore subject to voter referendum.

Accordingly, we reverse with directions to issue a peremptory writ of mandate ordering the voter registrar to place Wilde's referendum on the ballot.

FACTUAL AND PROCEDURAL HISTORY

### *Resolution 2016-02*

In January 2015, the City formed an ad hoc water rate committee (Committee). The Committee held public meetings and a two-hour town hall meeting during which it assessed the City's water infrastructure needs, considered a study on the City's water rates, and proposed a six-year tiered increase in water rates. The increase was intended to fund the replacement of a 105-year-old water storage tank and a significant number of similarly aged water main sections.

---

judicially noticeable"], overruled on another point in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

In March 2016, the city council passed Resolution 2016-02 by which it raised water rates according to a table that lists consumption charges according to type of residential unit served and the diameter of the water supply pipe. The new water rate structure reflects "an ascending base rate" formulated so that, "at the end of the five year period, the City would have its rates at a level that would give it the minimum local share needed to meet federal grant requirements" and to "meet funding requirements for overall projects." Resolution 2016-02 sets forth a five-year plan for a $15 million upgrade to the City's water storage and delivery infrastructure.

Consistent with the requirements of Proposition 218, the City provided notice of the public hearing on water rate adjustments and protest ballots with which residents could file an objection. The City received only 40 protest votes at a time when 800 were required for a successful protest. Thus, Resolution 2016-02 went into effect.

### *Wilde's Petition for Writ of Mandate*

After the resolution's adoption, Wilde gathered 145 voter signatures calling for a referendum to repeal the resolution. These signatures were verified. There is no dispute the number of voter signatures gathered by Wilde sufficed for a referendum. Nonetheless, the City's attorney informed Wilde the City refused to place the referendum on the ballot, stating: "The setting of Prop. 218 rates is an administrative act not subject to the referendum process. Also, Proposition 218 provides for initiatives ([Cal.Const. art.] XIII C, sec. 3), but not referenda."

In May 2016, Wilde filed a petition for writ of mandate to place her referendum on the ballot. The City opposed the petition. In July 2016, the trial court denied the writ petition. The trial court agreed with the City that the setting of new water rates constituted an administrative act that was not subject to referendum.

4

*Defeat of Initiative Measure W*

While Wilde's writ petition was pending in superior court, she gathered a sufficient number of signatures for an initiative to amend the City's water and sewer rate structure. The City placed Wilde's initiative on the November 8, 2016 ballot as Measure W. Measure W would have implemented a different water and sewer rate structure than that adopted by Resolution 2016-02. Measure W was rejected by the voters.

DISCUSSION

**I**

*Mootness*

As this court has previously noted, "An appeal is moot when a decision of 'the reviewing court "can have no practical impact or provide the parties effectual relief." ' (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214.) We have the duty to avoid deciding a moot appeal. ' " '[T]he duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' (*California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1484.)" (*Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 848-849.) Consequently, we are compelled to dismiss when it is impossible for this court to grant any effective relief. (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 120.)

Here, the City argues this appeal is moot. The City reasons the voters' rejection of Wilde's initiative renders it impossible for us to grant Wilde any relief regarding her referendum. The City reasons the defeat of Wilde's initiative signaled the voters' endorsement of the water rates set by Resolution 2016-02. We disagree based on the differences between Wilde's initiative and her referendum.

5

Article II, sections 8 and 9, of the California Constitution contain express reservations of the voters' initiative and referendum powers. (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 581 (*Pala*).) Article II, section 8, subdivision (a), declares: "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." And article II, section 9, subdivision (a), states: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." The fundamental difference between the voter powers in Article II, sections 8 and 9 is that " '[r]eferenda do not enact law. . . .' (*Referendum Committee v. City of Hermosa Beach* [(1986)] 184 Cal.App.3d 152, 157.) That is the function of the initiative." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 242.) Another key difference is that "tax measures are exempt from referendum. (See *Rossi v. Brown* (1995) 9 Cal.4th 688, 697 [(*Rossi*)].) But the state Constitution imposes no similar limitation on the initiative. (See *id*. at pp. 699-705.)" (*Bighorn-Desert*, *supra*, 39 Cal.4th at p. 212, fn. 3.)

We reject the City's mootness argument because of the different aims of Wilde's referendum and her initiative. Wilde's initiative sought to replace the City's water rate system with a different set of water rates for Dunsmuir's residents. By contrast, Wilde's referendum did not seek to replace the water rates implemented by the City's adoption of Resolution 2016-02 but instead to repeal the resolution. This means City voters could have rejected Wilde's initiative based on their dislike of the proposed new rates *and* could also be willing to vote for Wilde's referendum based on a concurrent dislike of the water rates established by Resolution 2016-02.

Assuming for the sake of this mootness issue that the water rates adopted by Resolution 2016-02 are subject to challenge by referendum, this court would have the

6

ability to grant effective relief by ordering Wilde's referendum to be placed on a future ballot. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 (*Yost*).) In *Yost*, the California Supreme Court ordered that a referendum be placed on the ballot three years after the challenged resolutions were adopted by the city council. (*Id.* at p. 565, 574.) Here, the City does not contend Resolution 2016-02 has been repealed or is no longer effective. Instead, the record shows the water rate adopted by the resolution continues to increase until 2021 in order to upgrade the City's water infrastructure. Consequently, the appeal is not moot because this court has the power to grant effective relief in the form of a disposition that places Wilde's referendum on a future ballot.

## II

### *Referendum*

Wilde contends the trial court erred in concluding that Resolution 2016-02 was not subject to voter referendum. The contention has merit.

### A.

### *Principles of Review*

In construing sections of the California Constitution, we follow well-settled principles of statutory interpretation. "Our primary objective is to ascertain the legislative intent. In so doing, we first examine the particular words used, keeping in mind that words should be interpreted in the context of the relevant constitutional provisions as a whole. (*Quintano v. Mercury Casualty Co*. (1995) 11 Cal.4th 1049, 1055; *Schmidt v. Retirement Board* (1995) 37 Cal.App.4th 1204, 1210.) If there is no ambiguity, the constitutional provision should be interpreted according to its plain meaning. (*Mutual Life Ins. Co. v. City of Los Angeles, supra,* 50 Cal.3d at p. 407.) Where an ambiguity exists, we may resort to extrinsic evidence to determine the intent of the Legislature or of the voters. (*Ibid*.)" (*Pala, supra,* 54 Cal.App.4th at pp. 579-580.) In considering the scope of the referendum power, we also heed the tenet

7

of constitutional interpretation that "[o]ur review of this appeal is also strictly circumscribed by the long-established rule of according extraordinarily broad deference to the electorate's power to enact laws by initiative." (*Id.* at pp. 573-574.)

As the California Supreme Court has emphasized, constitutional "provisions must be construed liberally in favor of the people's right to exercise the reserved powers of initiative and referendum. The initiative and referendum are not rights 'granted the people, but . . . power[s] reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." ' (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591, fn. omitted; see also *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 241.)" (*Rossi, supra,* 9 Cal.4th at p. 695.)

In conducting our review of the constitutional issue in this case, we apply the de novo standard of review because the facts are not in dispute and the issue is one of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.)

**B.**

***Referendum Power***

This case turns on the effect, if any, that Proposition 218 might have had on voters' referendum powers. Consequently, we begin by delving into the context of Proposition 218. "Proposition 218 can best be understood against its historical background, which begins in 1978 with the adoption of Proposition 13. 'The purpose of Proposition 13 was to cut local property taxes. [Citation.]' (*County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1451.) Its principal provisions limited ad valorem

8

property taxes to one percent of a property's assessed valuation and limited increases in the assessed valuation to two percent per year unless and until the property changed hands. (Cal. Const., art. XIII A, §§ 1, 2.) [¶] To prevent local government from subverting its limitations, Proposition 13 also prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate. (Cal. Const., art. XIII A, § 4; *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 6–7.) It has been held, however, that a special assessment is not a special tax within the meaning of Proposition 13. (*Knox v. City of Orland* (1992) 4 Cal.4th 132, 141, and cases cited.) Accordingly, a special assessment could be imposed without a two-thirds vote. [¶] In November 1996, in part to change this rule, the electorate adopted Proposition 218, which added Articles XIII C and XIII D to the California Constitution." (*Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 681–682.)

At the time when voters were presented with Proposition 218, several published decisions had limited the reach of voter initiatives to challenge local tax measures. The first, *Myers v. City Council of City of Pismo Beach* (1966) 241 Cal.App.2d 237 (*Myers*) held that because taxes are not subject to challenge by referendum they are also not subject to challenge by an initiative that is the functional equivalent of a referendum. (*Id.* at p. 243 ["A proposed initiative ordinance cannot be used as an indirect or backhanded technique to invoke the referendum process against a tax ordinance of a general law city . . ."].) *Dare v. Lakeport City Council* (1970) 12 Cal.App.3d 864 (*Dare*) further limited the initiative power by holding that " 'the Initiative process does not lie with respect to statutes and ordinances 'providing for tax levies." ' " (*Id.* at p. 867.) And *City of Woodlake v. Logan* (1991) 230 Cal.App.3d 1058 (*City of Woodlake*) reiterated the holdings of *Myers* and *Dare* by stating that "[i]t is . . . not permissible to achieve a prohibited purpose by disguising as an initiative a referendum addressing exempted matters." (*Woodlake* at p. 1063.)

9

In *Rossi, supra*, 9 Cal.4th 688 the California Supreme Court addressed the scope of initiative power shortly before the voters decided on Proposition 218.  *Rossi* abrogated *Myers*, *Dare*, and *City of Woodlake* by holding that "the referendum provisions expressly preclude a referendum on statutes and ordinances which impose a tax, no such limitation is imposed on the people's exercise of their reserved initiative power."  (*Id.* at p. 693.)  The *Rossi* court explained that the "obligation to jealously guard the people's reserved right of initiative precludes the restriction on its exercise suggested by the *Myers* court" and therefore rejected the approach of *Myers* and its progeny.  (*Id.* at p. 711.)  Even so, *Rossi* based its decision on provisions of both the City and County of San Francisco's charter and article II, section 9, of the California Constitution.  (*Id.* at p. 694.)

For purposes of this appeal, the common denominator of the cases *Myers* to *Rossi* was the focus on the extent to which *initiatives* could be used to challenge local tax resolutions and ordinances.  From *Myers* through *Rossi*, there was no dispute that tax measures were not subject to *referendum*.  (See *Myers, supra,* 241 Cal.App.2d at p. 243; *Dare, supra,* 12 Cal.App.3d at p. 867; *City of Woodlake, supra,* 230 Cal.App.3d at p. 1063; *Rossi, supra,* 9 Cal.4th at p. 693.)  The context within which the voters adopted Proposition 218 is important because voters are "presumed to be aware of existing laws and judicial construction thereof."  (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11 (*Lance W.*); accord *People v. Valencia* (2017) 3 Cal.5th 347, 369.)  And it is with the background of *Myers*, *Dare*, *City of Woodlake*, and *Rossi* that California voters considered Proposition 218 in November 2006.

Proposition 218 is titled the "Right to Vote on Taxes Act."  (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 1, p. 108.)  In its findings and declarations section, Proposition 218 states:  "The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases.  However, local governments have subjected

taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself.  This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (*Ibid.*)  Section 5 of the text of Proposition 218 declares, "The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue *and enhancing taxpayer consent*." (*Id.* § 5, at p. 109, italics added.)

The language added by Proposition 218 to the California Constitution as article XIII C, section 3, states:  "Initiative Power for Local Taxes, Assessments, Fees and Charges.  Notwithstanding any other provision of this Constitution, including, but not limited to, Sections 8 and 9 of Article II, the initiative power shall not be prohibited or otherwise limited in matters of reducing or repealing any local tax, assessment, fee or charge.  The power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments and neither the Legislature nor any local government charter shall impose a signature requirement higher than that applicable to statewide statutory initiatives."

The language of section 3 is declarative of voters' prerogative to decide on local taxes, assessments, and fees by initiative.  In the context of the decision in *Myers, supra,* 241 Cal.App.2d 237 and its progeny, section 3's purpose and function concern the preservation of voters' initiative powers.  The language of section 3 is positive in that it confirms voter initiative rights and contains no negative language that limits any power of the voters.  Section 3 cannot be read to repeal California voters' referendum power to challenge local resolutions and ordinances.  " 'We cannot presume that . . . the voters intended the initiative to effect a change in law that was not expressed or strongly implied in either the text of the initiative or the analyses and arguments in the official ballot

11

pamphlet.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 364, quoting *Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 857-858.)

Our conclusion that Proposition 218 did not negatively impact voters' referendum power is bolstered by the text, analysis, and arguments for Proposition 218 that were presented to the voters in the ballot pamphlet. (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), analysis by the Legislative Analyst for Prop. 218, p. 74.) The summary of Proposition 218 provided by the Legislative analyst in the ballot pamphlet noted that among other things, "The measure states that Californians have the power to repeal or reduce any local tax, assessment, or fee through the initiative process. This provision broadens the existing initiative powers available under the State Constitution and local charters." This summary was echoed in the ballot argument made by proponents of Proposition 218 where they stated: "Proposition 218 expands your voting rights. It CONSTITUTIONALLY GUARANTEES your right to vote on taxes." (*Id.* at p. 77 [rebuttal to argument against Proposition 218], original emphasis.)[2]

Proposition 218's focus on preserving initiative rights on tax levies did not require any focus on the referendum power because taxes have never been subject to referendum. (*Bighorn-Desert*, *supra*, 39 Cal.4th at p. 212.) Insofar as Proposition 218 affected voters' rights, the initiative several times reiterated the goal of increasing voters' rights to vote on local legislation. (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 1, p. 108-109.) Section 5 declared the purpose of Proposition 218 was to enhance local taxpayers' consent. (*Id.* at p. 109.) Conspicuously absent from the text of Proposition 218 is any language that limits voter rights. (See *id.* at pp. 108-109.) For this reason, the Legislative Analyst informed voters Proposition 218 "broadens the existing initiative

---

[2] We consider these statements because "[b]allot summaries and arguments are accepted sources from which to ascertain the voters' intent and understanding of initiative measures." (*Lance W., supra*, 37 Cal.3d at p. 888, fn. 8.)

12

powers" of voters. (*Id.* at p. 74.) No mention is made of the referendum power or any proposed limitations on voter power in general.

Proposition 218 was not required to reinvigorate the referendum power for two reasons. First, section 9 is self-executing and does not require implementing legislation at the state or local level. (*Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765, 777 (*Midway Orchards*).) Second, the holdings in *Myers*, *Dare*, and *City of Woodlake* addressed only the limits of the voters' initiative powers to challenge local ordinances. (*Myers, supra,* 241 Cal.App.2d at p. 243; *Dare, supra,* 12 Cal.App.3d at p. 867; *City of Woodlake, supra,* 230 Cal.App.3d at p. 1063.) For this reason, the proponents of Proposition 218 had no reason to mention the referendum power when seeking to preserve voter powers. In short, the context, language, and analysis of Proposition 218 all point to expanded initiative powers without any effect on the voters' ability to challenge local legislation by referendum.

Having concluded Proposition 218 did not curtail the voters' referendum powers, we turn to the question of whether the resolution at issue in this case is legislative or administrative in nature.[3]

## B.

### *Whether Resolution 2016-02 Set Water Rates in an Administrative Manner*

Wilde contends the trial court erred in finding Resolution 2016-02 is not subject to voter referendum because it represents an administrative action. We agree.

---

[3]     Wilde and the City agree Resolution 2016-02's water rate charges are fees rather than taxes. Based on the parties' agreement, we assume without deciding that water service charge is a fee under article XIII D when it is imposed, as here, as an incident of property ownership. (See *Bighorn-Desert*, *supra*, 39 Cal.4th at p. 215.) Consequently, the prohibition on the use of referenda to challenge tax measures does not apply here. (*Id.* at p. 215.)

13

### 1. *Administrative Acts by Local Government*

As the California Supreme Court has explained, "The powers of referendum and initiative apply only to legislative acts by a local governing body (*Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 516, fn. 6). Acts of a local governing body which, in a purely local context, would otherwise be legislative and subject to referendum may, however, become administrative 'in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state.' (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 596, fn. 14; see *Housing Authority v. Superior Court* (1950) 35 Cal.2d 550)." (*Yost, supra,* 36 Cal.3d at pp. 569-570.) However, "[c]ourts are not 'to automatically infer that a statutory scheme restricts the power of initiative or referendum merely because some elements of statewide concern are present.' (*DeVita* [*v. County of Napa* (1995)] 9 Cal.4th [763,] 780-781.) '[I]t is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decision making implies a legislative intent to bar the right of initiative. Rather, courts must inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body.' (*Id.*, at p. 781.)" (*Totten v. Board of Supervisors* (2006) 139 Cal.App.4th 826, 838 (*Totten*).)

Acts of a local governmental entity may also be administrative in nature when they merely carry out previously determined policies rather than constituting new legislative policy. "To determine whether an initiative enacts legislation, 'it is the substance, not the form that controls.' (*Marblehead v. City of San Clemente* (1991) 226 Cal.App.3d 1504, 1509.) The test to distinguish a legislative act from an executive or administrative one is well-established: ' " ' "The power to be exercised is legislative in

14

its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it." ' " ' [Citation]; . . . 'Acts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence.' [Citations.]" ' (*City of San Diego v. Dunkl* [(2001)] 86 Cal.App.4th [384,] 399-400, italics omitted.)" (*Park At Cross Creek, LLC v. City of Malibu* (2017) 12 Cal.App.5th 1196, 1203-1204.)

### 2. *Resolution 2016-02*

We proceed to consider whether Resolution 2016-02 prescribes a new policy or plan, or whether it administratively carries out previously determined legislative policies and plans.[4] We begin with the factual recitals articulated in Resolution 2016-02. These recitals are uncontested and establish the following about the 2015 Dunsmuir Water Master Plan:

The process of examining water rates and City infrastructure began when "the City commissioned an update to the 1994 Water Rate Master Plan which is designated the 2015 Dunsmuir Water Master Plan." To formulate the new water rate master plan, "the City Council appointed an Ad Hoc Committee of two council [] members and three community members to review, comment and provide recommendations regarding the Water Master Plan update and the Water Utility Rate study." "[T]he 2015 Water Utility

---

[4] The City does not argue state law dictates the new water rate structure in Resolution 2016-02 so the City must administratively conform to statewide regulation. (See *Totten, supra,* 139 Cal.App.4th at p. 838.)

15

Rate Study . . . reported need to increase rates for water utility services to enable replacement of water mains and water storage tank." The ad hoc committee also identified "a significant number of water main sections that should have been replaced years ago, and [the] need to replace over 105 years old water storage tank . . . ." In the notice of public hearing on proposed water rates, the City reported that "the proposed rates are based on the Water Utility Rate study prepared by PACE Engineering . . . ." Ultimately, "the Ad Hoc Committee and the City Council have found that the proposed rates are equitable and fairly distribute the burden of system costs among the various classes of customers."

The new water rates adopted in Resolution 2016-02 are not an administrative adjustment of rates according to the previously established 1994 Water Rate Master plan. The new water rates are the product of a newly formulated set of policies that implemented a new set of choices: to replace a 105-year-old water storage tank as well as selected old water mains. In addition to these decisions to replace infrastructure, the 2015 Dunsmuir Water Master Plan also represents policy choices about how to allocate the new infrastructure costs.

The City's own briefing states that "the legislative decision here took the form of public hearings and the eventual adoption of a water master plan." At oral argument, the City's counsel confirmed the City's position that the water rate master plan is legislative in nature. We agree that the City's action is legislative in nature. " 'Legislative acts of a city which establish general policies and objectives, and the ways and means of accomplishing them, are subject to the referendum process.' " (*Worthington v. City Council of Rohnert Park* (2005) 130 Cal.App.4th 1132, 1140, quoting *W.W. Dean & Associates v. City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1374.) That the new water rate master plan was adopted by resolution, rather than ordinance, does not matter for our purposes because "the referendum may be invoked whether the [local]

16

measure is denominated an ordinance or resolution." (*Midway Orchards, supra,* 220 Cal.App.3d at p. 777.)

Indeed, Resolution 2016-02 represents legislative policymaking in two separate respects. First, the resolution adopted a new water rate master plan that departed from continued maintenance of old water storage and transmission facilities in favor of a $15 million infrastructure upgrade plan. This plan may be sound policy, but it is new policy rather than administration of prior policy. Second, the resolution adjusted the allocation of rates to be charged to the various users of the City's water. This adjustment represented discretionary choices made in a new policy, rather than continuation of the policy of the 1994 water rate plan. Consequently, Resolution 2016-02 is subject to referendum because it is legislative, and not administrative, in nature.

## C.

### *Whether Resolution 2016-02 is Not Subject to Referendum Because of the Essential Government Service Exemption*

The City contends Resolution 2016-02 impinges on an essential government service that is not subject to referendum. Specifically, the City argues Wilde's "referendum proposal, relating to essential government services, is improper and would lead to uncertainty in the planning and fiscal administration of government budgets."[5] Wilde counters that "the water rate increases were intended to finance an

---

[5] The City does not develop its argument by connecting the essential government service exception to the facts of this case. Indeed, the City's argument on this issue does not contain a single citation to the appellate record. This sort of undeveloped and unsupported argument generally warrants the argument being deemed forfeited. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Due to the importance of this issue, however, we exercise our discretion to consider the City's contention. "[T]he application of the forfeiture rule is not automatic and we may excuse forfeiture in cases presenting 'an important legal issue.' " (*Cleveland National Forest Foundation v. San Diego Association of Governments* (2017) 17 Cal.App.5th 413, 434, quoting *In re S.B.* (2004) 32 Cal.4th 1287, 1293.) We note, however, the City does not argue Resolution 2016-02

17

improvement project, not support 'essential government services' . . . ." Wilde has the better argument.

### 1. *Wilde's Referendum*

Wilde's petition for a referendum on Resolution 2016-02 stated, "We request the text of Resolution Number 2016-02 be entirely repealed by the Dunsmuir City Council or be submitted to a vote of the people." The petition contained no restraint on the City Council that would have disallowed adoption of a different water rate master plan or revised rate allocation structure. The petition also provided the additional option of voter approval for the 2015 Dunsmuir Water Master Plan.

### 2. *The Essential Government Service Exception*

In assessing the City's attempt to invoke the essential government service exception to voters' referendum power, we begin with the California Supreme Court's guidance on this topic in four cases: *Hunt v. Mayor and Council of City of Riverside* (1948) 31 Cal.2d 619 (*Hunt*), *Geiger v. Board of Sup'rs of Butte County* (1957) 48 Cal.2d 832 (*Geiger*), *Rossi, supra*, 9 Cal.4th 688, and *Bighorn-Desert, supra*, 39 Cal.4th 205.

We have already noted that "referendum provisions of the constitution and of charters and statutes should, as a general rule, be liberally construed in favor of the reserved power." (*Hunt, supra,* 31 Cal.2d at p. 628.) Even so, "it is proper and important to consider what the consequences of applying it to a particular act of legislation would be, and if upon such consideration it be found that by so applying it the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental

---

implicates an essential government service due to the importance of water supply to residents, but only that Wilde's referendum is "disturbing to proper fiscal administration." Accordingly, we are called to consider only whether Wilde's referendum undermines the City's fiscal administration of its budget so that the trial court properly denied the writ petition.

18

power, the practical application of which is essential, and perhaps, as in the case of the power to compel the improvement of streets, indispensable, to the convenience, comfort, and well-being of the inhabitants of certain legally established districts or subdivisions of the state or of the whole state, then in such case the courts may and should assume that the people intended no such result to flow from the application of those powers, and that they do not so apply.' " (*Id.* at pp. 628–629, quoting *Chase v. Kalber* (1915) 28 Cal.App. 561, 569-570.) In short, legislation is not subject to referendum if it precludes the functioning of essential government services. (*Ibid.*)

*Geiger* involved a county ordinance imposing a sales and use tax as authorized by the Legislature in the Bradley-Burns Act. (*Geiger, supra,* 48 Cal.2d at p. 832.) The *Geiger* court recognized the referendum power as reserved under the California Constitution does not allow for tax measures to be challenged by referendum. (*Id.* at p. 836.) Thus, the question in *Geiger* was whether the Legislature could *statutorily* confer the referendum power despite limitations on the *constitutional* power of referendum. (*Id.* at p. 837.) The *Geiger* court held the Legislature did not have "the power to extend or expend the scope of referendum." (*Ibid.*) The *Geiger* court further held the Legislature did not intend in the Bradley-Burns Act to make county sales and use tax ordinances subject to referendum. (*Ibid.*) In so holding, the *Geiger* court also noted the referendum power did not include local voters' ability to retroactively cripple budgeted spending consistent with statewide policy. As the Supreme Court explained this prohibition on referenda being available to challenge "tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies." (*Id.* at p. 840.)

In *Rossi*, *supra*, 9 Cal.4th 688, the California Supreme Court again revisited the essential government services exception to the referendum power. The *Rossi* court reiterated that "if a tax measure were subject to referendum, the county's ability to adopt

a balanced budget and raise funds for current operating expenses through taxation would be delayed and might be impossible.  As a result, the county would be unable to comply with the law or to provide essential services to residents of the county." (*Rossi*, *supra*, 9 Cal.4th at p. 703.)

In *Bighorn-Desert*, the California Supreme Court held "that section 3 of article XIII C grants local voters a right to use the initiative power to reduce the rate that a public water district charges for domestic water." (*Bighorn-Desert*, *supra*, 39 Cal.4th at p. 209.)  Nonetheless, the high court cautioned that "this new constitutional provision does not grant local voters a right to impose a voter-approval requirement on all future adjustments of water delivery charges, and that the proposed initiative at issue here was properly withheld from the ballot because it included a provision to impose such a requirement." (*Ibid.*)  Thus, *Bighorn-Desert* and *Rossi* teach that voters cannot throw government finances into chaos by vitiating the regularly budgeted expenditures for essential government services.

### 3. *Whether the Exception Applies to Resolution 2016-02*

On the facts of this case, we conclude the essential government services exception does not bar Wilde's referendum from the ballot.  Wilde's referendum was not aimed at previously existing City water rates or water delivery services.  Had Wilde's referendum been placed on the ballot and passed, it would have had the effect of reverting to the City's 1994 Water Rate Master Plan.  Rather than invalidating the regular expenditure of previously budgeted funds for essential government services, Wilde's referendum would have prospectively cancelled the City's newly adopted master plan to spend $15 million on infrastructure and reallocation of water costs.  In essence, Resolution 2016-02 constitutes policymaking legislation that is subject to referendum.

The fact that Resolution 2016-02 includes a financial component does not insulate it from challenge by voter referendum.  The resolution does not represent the ordinary

20

working or budgeting of the City. As the City itself emphasizes in its briefing, the new water rate master plan was the product of an ad hoc group that studied the City's water infrastructure and billing rate structure. The Resolution represents policy choices and marks out a different approach to the City's water infrastructure and rates. For this reason, Wilde's referendum was not subject to the exception on voter referendum powers made for measures that will undermine ongoing and essential governmental services and budgeting.

We reject the City's reliance on *Citizens for Jobs and the Economy v. County of Orange* (2002) 94 Cal.App.4th 1311. *Citizens for Jobs* arose out of the voters' approval of an initiative that required future electorate ratification of certain land use projects prior to their effect – even if approved by the board of supervisors. (*Id.* at p. 1328.) *Citizens for Jobs* held the initiative was "clearly beyond the power of the electorate" for several reasons, one of which was that "[i]t interferes with the essential government functions of fiscal planning and land use planning." (*Id*. at p. 1324.) Wilde's referendum, however, contains no prohibition on the City's future ability to study, plan, or implement a new water rate plan in the event voters approve the referendum. Wilde's referendum seeks repeal of Resolution 2016-02 without constraining the City in its ability to formulate and implement a different water rate master plan.

For the same reason, we are not persuaded by the City's reliance on *City of Atascadero v. Daly* (1982) 135 Cal.App.3d 466. *City of Atascadero* involved a proposed initiative ordinance that "would have required the City to submit any revenue-raising measure to the voters for their approval before the measure could be implemented." (*Id.* at p. 468.) The proposed initiative was invalidated as a voter usurpation of the power to tax and as "an unlawful attempt to impair essential governmental functions through interference with the administration of the City's fiscal powers." (*Id.* at p. 470.) The continuing validity of this decision is questionable after the California Supreme Court in

*Rossi* mentioned *City of Atascadero* as one of the decisions in harmony with the overruled decisions in *Myers, supra,* 231 Cal.App.2d 237 and *Dare, supra,* 12 Cal.App.3d 864. (*Rossi*, *supra*, 9 Cal.4th at p. 705.) In any event, as we explained in our examination of *Citizens for Jobs, supra,* 94 Cal.App.4th 1311, Wilde's referendum proposes to repeal Resolution 2016-02 without limiting the City's future ability to study, plan, and implement a new water rate master plan.

Because Wilde's referendum does not undermine the City's ability to provide essential government services, she is entitled to have her referendum placed on the ballot.

## DISPOSITION

The judgment of dismissal of Leslie T. Wilde's petition for a writ of mandate is reversed and the case is remanded to the trial court with directions to issue a peremptory writ of mandate ordering the voter registrar to place Wilde's referendum on the ballot for the next municipal election. Leslie T. Wilde shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


_____/s/_____
HOCH, J.


We concur:


_____/s/_____
BUTZ, Acting P. J.


_____/s/_____
MURRAY, J.

22